IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| THERESA WAGNER; JENNIFER BRAEUNER; THE METROPOLITAN NASHVILLE EDUCATION ASSOCIATION; THE ANDERSON COUNTY EDUCATION ASSOCIATION; and THE TENNESSEE EDUCATION ASSOCIATION;<br><br>Plaintiffs;<br>v.<br><br>WILLIAM HASLAM, in his official capacity as the GOVERNOR OF TENNESSEE; CANDACE MCQUEEN, in her official capacity as TENNESSEE COMMISSIONER OF EDUCATION; B. FIELDING ROLSTON, MIKE EDWARDS, ALLISON CHANCEY, LONNIE ROBERTS, CAROLYN PEARRE, WENDY TUCKER, LILLIAN HARTGROVE, CATO JOHNSON, and TERESA SLOYAN, in their official capacities as MEMBERS OF THE TENNESSEE BOARD OF EDUCATION; THE METROPOLITAN NASHVILLE BOARD OF PUBLIC EDUCATION; and THE ANDERSON COUNTY SCHOOLS BOARD OF EDUCATION;<br><br>Defendants. | CIVIL ACTION NO.<br>______________________ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. NATURE OF THE ACTION

1. In this lawsuit, Plaintiffs challenge the constitutionality of those state and school district evaluation policies implementing Public Chapter 2 of the Public Acts of 2010 ("Act") that require the evaluation of thousands of public school teachers in Tennessee based substantially on the standardized test scores of students who they do not instruct in the courses

tested. Plaintiffs contend that these state and school district evaluation policies violate Plaintiffs' substantive due process and equal protection rights under the Fourteenth Amendment to the United States Constitution.

2. Plaintiffs seek (1) a declaratory judgment that the state and school district evaluation policies are unconstitutional on their face and as applied, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure; (2) an injunction against the continued implementation of those policies and remedying the harm caused by their implementation to date, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the Court's inherent equitable powers; and (3) an award of attorneys' fees, pursuant to 42 U.S.C. § 1988.

## II. JURISDICTION AND VENUE

3. This Court has federal-question subject-matter jurisdiction under 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 1983 and the United States Constitution. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3), because this action seeks to redress the deprivation, under color of State law, of rights secured by the United States Constitution.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## III. PARTIES

5. Plaintiff Theresa Wagner teaches Physical Education to students in grades 5-8 at Gra-Mar Middle Prep in Nashville, Tennessee, which is part of the Metropolitan Nashville Public School District ("Nashville District"). Ms. Wagner has taught for twenty-six years, including for seventeen years in the Nashville District, eleven of which have been at Gra-Mar Middle Prep. Ms. Wagner serves as the Healthy Schools Team Coordinator for Gra-Mar. In 2013-14 she received a "Healthy Schools Champion" award from the district in recognition of that work. She

also is active in the school community, serving as the Lead Teacher for the Teacher Incentive Fund, managing the school website, and previously serving on the district's Strategic Compensation Committee. She consistently has received positive performance reviews based on actual observations of her teaching, and is recognized by her colleagues and the school community as an effective teacher. She is licensed to teach Physical Education in grades K-12, and has completed graduate coursework for teaching Adapted Physical Education to students with disabilities.

6. Plaintiff Jennifer Braeuner teaches Visual Arts to students in grades 6-8, including one special education class, at Norris Middle School in Norris, Tennessee, which is part of the Anderson County Public School District ("Anderson District"). Ms. Braeuner has taught for six years at Norris Middle School, after completing a year-long internship at a different school. The quality of work her art students create has been recognized; for example, a student's artwork was selected for a special exhibition at the Knoxville Museum of Art, and another student recently won a district-wide poster contest. Ms. Braeuner sponsors a school art club, and she runs a weekly school-wide design contest to engage students in art outside the classroom. She also is active in the school community, serving as a track and field coach, a substitute member of her School Leadership Team, and previously as a mentor for graduating high school students transitioning to community college programs. Ms. Braeuner consistently has received positive performance reviews based on actual observations of her teaching, and is recognized by colleagues and the school community as an effective teacher. She has a Master's Degree in Art Education, and is licensed to teach Visual Arts in grades K-12.

7. Plaintiff Metropolitan Nashville Education Association ("MNEA") is a voluntary association whose members are teachers and other professional employees of the Nashville District. The MNEA is a "professional employees' organization," as that term is defined in Tenn. Code Ann. § 49-5-602(9), which exists for the purpose of promoting the professional status and growth of educators and the welfare of students. MNEA has devoted substantial resources over the past three years to responding to the arbitrary and irrational mandates of the state's evaluation policy and the Nashville District's evaluation policy and has had to divert resources from other organizational priorities in order to do so. MNEA brings this action on behalf of itself, Plaintiff Theresa Wagner, and other elementary and secondary teachers who are evaluated using student standardized tests that do not reflect the instruction they provide in the courses they teach. These members, like Ms. Wagner, teach grades and courses in which student learning is not measured by a state standardized test and are being evaluated, under the challenged policies, based substantially on student standardized tests scores that measure student learning in courses they do not instruct, and for some teachers, the standardized test scores of students they do not teach at all.

8. Plaintiff Anderson County Education Association ("ACEA") is a voluntary association whose members are teachers and other professional employees of the Anderson District. The ACEA is a "professional employees' organization," as that term is defined in Tenn. Code Ann. § 49-5-602(9), which exists for the purpose of promoting the professional status and growth of educators and the welfare of students. ACEA has devoted substantial resources over the past three years to responding to the arbitrary and irrational mandates of the state's evaluation policy and Anderson District's evaluation policy and has had to divert resources from

other organizational priorities in order to do so. ACEA brings this action on behalf of itself, Plaintiff Jennifer Braeuner, and other elementary and secondary teachers who are evaluated using student standardized tests that do not reflect the instruction they provide in the courses they teach. These members, like Ms. Braeuner, teach grades and courses in which student learning is not measured by a state standardized test and are being evaluated, under the challenged policies, based substantially on student standardized tests scores that measure student learning in courses they do not instruct, and for some teachers, the standardized test scores of students they do not teach at all.

9. Plaintiff Tennessee Education Association ("TEA") is a voluntary membership organization. The TEA is a "professional employees' organization," as that term is defined in Tenn. Code Ann. § 49-5-602(9), whose mission is to improve the quality of public education throughout the State. For that reason, TEA is committed to ensuring that teacher evaluation systems function effectively to identify both teachers who are performing well and those who need assistance to improve. TEA has devoted substantial resources over the past three years to responding to the arbitrary and irrational mandates of the state's evaluation policy and school districts' evaluation policies and has had to divert resources from other organizational priorities in order to do so. TEA represents over 46,000 elementary and secondary teachers, school administrators, education support professionals, higher education faculty, and students preparing to become teachers. TEA brings this action on behalf of itself, the individual plaintiffs identified in paragraphs 5 and 6 above ("Individual Plaintiffs"), and thousands of other elementary and secondary teachers throughout the State who teach grades and courses in which student learning is not measured by a state standardized test. These members, like the Individual Plaintiffs, are

being evaluated based substantially on student standardized test scores that measure student learning in courses they do not instruct, and for some teachers, the standardized test scores of students they do not teach at all.

10. Defendant William Haslam is the Governor of the State of Tennessee. As Governor, Defendant Haslam has the duty under Article III, Section 10, of the Tennessee Constitution to take care that the laws be faithfully executed, including the Act and the state policies implementing the Act that Plaintiffs challenge in this complaint. Governor Haslam is sued solely in his official capacity.

11. Defendant Tennessee Commissioner of Education Candace McQueen is responsible, by and through her staff at the Tennessee Department of Education ("DOE"), for implementing state education laws and policies established by the legislature or the Tennessee Board of Education ("State Board"). Tenn. Code Ann. § 49-1-201(a). In this capacity, among other things, the Commissioner proposes policies to the State Board for implementing the Act, implements those policies once approved by the State Board, and approves individual school district evaluation policies adopted to comply with the State Board's policies and the Act. *Id.* § 49-1-201(a), (c)5, (c)(20), (c)(22). Commissioner McQueen is sued solely in her official capacity.

12. Defendants B. Fielding Rolston, Mike Edwards, Allison Chancey, Lonnie Roberts, Carolyn Pearre, Wendy Tucker, Lillian Hartgrove, Cato Johnson, and Teresa Sloyan are members of the Tennessee State Board of Education. The State Board is responsible for setting the policies for "evaluating individual teachers" and "evaluating individual student progress and achievement" under the Act. *Id*. § 49-1-302(a)(2)(B-C). The State Board also establishes the

state policies governing teacher evaluation and compensation pursuant to the Act. *Id.* § 49-1-302(a)(5)(A-B). Pursuant to this authority, the State Board has adopted Teacher and Principal Evaluation Policy 5.201 ("State Evaluation Policy," attached as Exhibit A), which is being challenged in this case. All defendant members of the State Board are sued solely in their official capacities.

13. Defendant Metropolitan Nashville Board of Public Education ("Nashville Board") administers and manages the Nashville District public schools. As required by the Act, and subject to the policies and required approval of the State Board and DOE, the Nashville Board adopted a school district evaluation policy ("Nashville Evaluation Policy"), which is described in part in the document "TEAM Evaluation for Teachers" attached as Exhibit B. The Nashville Board is responsible for implementing and enforcing that Policy, under which Ms. Wagner and other teachers represented by MNEA, by policy and/or by practice, are evaluated based substantially on student standardized test scores that measure student learning in courses they do not instruct, and for some teachers, the standardized test scores of students they do not teach at all.

14. Defendant Anderson County School Board of Education ("Anderson Board") administers and manages the Anderson District public schools. As required by the Act, and subject to the policies and required approval of the State Board and DOE, the Anderson Board adopted the school district evaluation policy ("Anderson Evaluation Policy"), attached as Exhibit C. The Anderson Board is responsible for implementing and enforcing that Policy, under which Ms. Braeuner and other teachers represented by ACEA, by policy and/or by practice, are evaluated based substantially on student standardized test scores that measure student learning in

courses they do not instruct, and for some teachers, the standardized test scores of students they do not teach at all.

## IV. THE ACT'S EVALUATION MANDATES AND THEIR IMPLEMENTATION THROUGH THE CHALLENGED STATE AND SCHOOL DISTRICT EVALUATION POLICIES

15. On January 16, 2010, then-Governor Phil Bredesen signed into law the Act, which its sponsors labeled the "First to the Top Act" and is now codified at sections 49-1-302 *et seq*., 49-1-602 *et seq.*, and 49-5-506 *et seq.* of the Tennessee Code.

16. The Act, *inter alia*, requires school districts to conduct annual performance evaluations of all teachers. Tenn. Code Ann. § 49-1-302(d)(2).

17. Under the Act as it was in effect during the 2011-12 and 2012-13 school years, fifty percent of each teacher's evaluation was based on "student achievement data" as follows:

a. Thirty-five percent of the overall evaluation was "based on student growth data as represented by the Tennessee Value-Added Assessment System (TVAAS) . . . or some other comparable measure of student growth, if no such TVAAS data is available" (the "student growth component"), provided that the alternative measure was approved by the State Board. *Id.* § 49-1-302(d)(2)(B)(ii).

b. Fifteen percent of the overall evaluation was based on other measures of student achievement selected from a list of such measures approved by the State Board, which included school-level TVAAS estimates (the "other achievement component"). *Id.* § 49-1-302(d)(2)(B)(iii); State Evaluation Policy at 2-4.

18. The Act did not specify how the remaining fifty percent of each teacher's evaluation was calculated, except to require that it be based at least partially on observation data. Tenn. Code Ann. § 49-1-302(d)(2)(C). Under both the Nashville Evaluation Policy and the Anderson Evaluation Policy (collectively the "District Evaluation Policies"), as implemented during the 2011-12 and 2012-13 school years, the remaining fifty percent of the evaluation was based on observation of the teacher's performance.

19. Beginning with the 2013-14 school year, the Act was amended to reduce the total portion of an evaluation that must be based on student achievement data from fifty percent to forty percent for teachers "without access to individual data representative of student growth." *See* Public Chapter 105 of the Public Acts of 2013, signed into law April 11, 2013, *codified at* Tenn. Code Ann. § 49-1-302(d)(2)(B)(vi). For all such teachers, the "student growth" component of that student achievement data must comprise twenty-five percent of the overall evaluation and the "other achievement" component must comprise fifteen percent of the overall evaluation. *Id.*

20. The Act still does not specify how the remaining portion of such teachers' overall evaluations is to be calculated, except to require that it be based at least partially on observation data. *Id.* § 49-1-302(d)(2)(C). Under the Nashville Evaluation Policy and the Anderson Evaluation Policy, as implemented since the 2013-14 school year, the remaining sixty percent of the evaluation is based on observation of the teacher's performance.

21. The Act requires school districts to combine these evaluation components, in accordance with the percentage weights specified above, into a single rating on a five-category scale. Each teacher annually receives one of the following five overall evaluation ratings:

- Significantly Below Expectations (1)
- Below Expectations (2)
- At Expectations (3)
- Above Expectations (4)
- Significantly Above Expectations (5)

22. For less than half of teachers in Tennessee, the "student growth" component of their annual evaluations consists of a TVAAS estimate based on their students' standardized test scores for at least some of the courses the evaluated teacher instructs. This estimate is derived from a mathematical formula developed by Dr. William Sanders. The Sanders TVAAS formula is owned by SAS, Inc., a for-profit corporation that sells statistical analysis services to governments and corporations. Because TVAAS is the property of SAS, Inc., the precise formula and variables it employs have not been publicly disclosed. Broadly, however, TVAAS estimates are based on projections regarding individual students' expected growth in standardized test scores in a particular year that are generated from historical data that consists entirely of previous standardized test scores. The average amount of standardized test score growth above or below the growth predicted by the formula for a teacher's students is then attributed to the teacher through a statistical estimate, which does not directly measure teacher contributions to student learning, as his or her "value added" or "TVAAS" estimate.

23. Although many value-added models adjust for factors outside of teachers' control, such as students' attendance, socioeconomic status, and status as an English-language learner, TVAAS relies instead "entirely on the students' prior academic achievement" on standardized tests as the basis for predicting future performance. Specifically, the "prior academic

achievement" that is counted for purposes of the TVAAS estimate consists of students' scores on (i) the Tennessee Comprehensive Assessment Program ("TCAP"), the state standardized test program for students in grades 3-8 in mathematics, reading/language arts, social studies, and science; (ii) certain state-approved high school end-of-course ("EOC") examinations; and (iii), at districts' option, the K-2 achievement assessment.

24. The TCAP tests are separate, timed, multiple choice standardized tests in reading/ language arts, mathematics, science, and social studies taken by students in grades 3-8. Each TCAP test is designed to be directly aligned with, and to test student learning of, Tennessee curriculum content standards and performance indicators for the specific grade and course tested. The TCAP tests are not designed, and are neither valid nor reliable, for any other purpose.

25. Each EOC examination is a timed, multiple choice assessment designed to be directly aligned with, and to test student learning of, the curriculum content standards of the specific course for which it is the end-of-course test. The EOC tests are not designed, and are neither valid nor reliable, for any other purpose. EOC tests are approved for the following eight high school courses: Algebra I and II; English I, II and III; Biology I; Chemistry; and U.S. History.

26. The TVAAS was designed to estimate student learning growth only in the specific grades and courses tested by the TCAP and EOC (and, in some districts, the K-2 Assessment) tests whose results are input into the TVAAS formula. The TVAAS was not designed to, and does not, estimate student learning growth in any other courses.

27. Even for teachers who teach courses tested by these standardized tests, TVAAS estimates have a high margin of error, which results in large year-to-year changes in TVAAS

estimates. TVAAS reports include a raw estimate (now called a "growth measure") and a "standard error" indicating the level of uncertainty surrounding that estimate. For individual teacher results, the standard error is so large that reasonable confidence intervals to determine where the truth really lies generally span multiple effectiveness ratings. However, instead of establishing a confidence interval, the raw estimate is converted into a TVAAS result of 1, 2, 3, 4, or 5, which no longer reflects and does not allow school officials to take into account the uncertainty inherent in the estimate.

28. There are numerous reasons for the high margin of error in TVAAS estimates, including that many factors influence the student learning reflected by standardized test scores. According to the American Statistical Association, teachers account for approximately one to fourteen percent of the variability in student test scores, while other in-school and out-of-school factors that are outside teachers' control account for the vast majority of variation in student test scores. American Statistical Association Statement on Using Value-Added Models for Educational Assessment, April 8, 2014, at 2, 7 ("ASA Statement"), *available at* www.amstat.org/policy/pdfs/ASA_VAM_Statement.pdf. Out-of-school factors that may affect standardized test scores include parental support for learning, poverty, parents' education level, students' English language learner status, disabilities, innate ability, and health and nutrition. School-based factors that may affect such scores include class sizes, instructional time, curriculum, student peer culture, and resources including building facilities, textbooks, and computers. Additional factors contributing to the margin of error include that standardized tests are imperfect measures of student learning and that students are not randomly assigned to teachers and schools.

29. The TVAAS formula attempts to account for those other factors indirectly, by controlling for a particular student's achievement over a number of years, but that effort is necessarily incomplete, resulting in estimates of a teacher's effectiveness that are "unstable across statistical models, years, and classes that teachers teach." EPI Briefing Paper 278, *The Problems with the Use of Student Test Scores to Evaluate Teachers* at 4 (August 2010), *available at* www.epi.org/publication/bp278. Indeed, one recent analysis of the stability of value-added ratings found that only four to sixteen percent of the variation in a teacher's value-added ranking could be predicted from his or her rating in the previous year. *Id.* at 13. On information and belief, TVAAS estimates are at least as unstable and unreliable as the value-added ratings studied in the research described above.

30. Because of these limitations, the American Statistical Association warns that "[r]anking teachers by their [value-added] scores can have unintended consequences that reduce quality." ASA Statement at 2. Similarly, the National Academy of Sciences has urged that such estimates not play a significant part in high-stakes teacher evaluation systems. *See* Board on Testing and Assessment, Division of Behavioral and Social Sciences and Education, National Academy of Sciences, "Letter Report to the U.S. Department of Education on the Race to the Top Fund" (October 5, 2009), *available at* http://books.nap.edu/openbook.php?record_id=12780&page=1.

31. For all these reasons, the TVAAS estimates are unreliable and suspect even for teachers who instruct courses in which student learning is measured by one of the standardized tests used in the TVAAS formula. But more than half of public school teachers in Tennessee do not teach such courses ("non-TVAAS teachers"). Almost all of these non-TVAAS teachers are

being evaluated substantially based on school-level TVAAS estimates that do not reflect the contribution of these teachers to their students' learning in the courses they teach.

32. These school-level TVAAS estimates, which are sometimes referred to as "school-wide" TVAAS estimates, *see* State Evaluation Policy at 2-5, in fact reflect only the standardized test scores of students at a given teacher's school in the limited subjects, grades, and courses in which the state standardized tests used in the TVAAS estimates are given. School-level TVAAS estimates do not reflect student growth in the subjects and courses that non-TVAAS teachers are trained, licensed, and employed to teach. In fact, these school-level TVAAS estimates provide no indication at all as to the quality of the instruction a particular teacher provides; they provide a single estimate of how a school's standardized test scores in TVAAS-tested courses compare to projected test scores, which is then applied to all non-TVAAS teachers in a school.

33. For example, because the TCAP tests are given only in grades 3-8, a school-level estimate for any high school teacher is calculated from EOC test scores for just eight of the dozens of courses taught in Tennessee high schools: Algebra I and II; English I, II and III; Biology I; Chemistry; and U.S. History. Thus, a teacher who instructs only mathematics courses that follow Algebra II, for example, is evaluated based on the mathematics learning in Algebra I and II of students he or she has not yet had the opportunity to teach, as well student learning in certain English, Biology, Chemistry, and U.S. History courses. Teachers of art, world history, home economics, foreign languages, and many other courses who receive school-level TVAAS estimates likewise are evaluated on the basis of the work of other teachers in the eight specific courses in which EOC examinations are given.

34. These school-level estimates say nothing about the quality of the advanced math, art, or other teaching provided by an individual high school teacher who does not teach courses in which EOC tests are given, or about how much his or her students learn in the courses the teacher instructs. Instead, the school-level estimates result in assigning a number rating to the teacher that is unrelated to the work that the teacher is trained, licensed, and employed to provide.

35. Despite this, almost all non-TVAAS teachers are nevertheless being evaluated substantially on the basis of school-level TVAAS estimates under the challenged State and District Evaluation Policies. For many of these teachers, half of their annual evaluations for the 2011-12 and 2012-13 school years were based on school-level TVAAS estimates and forty percent of their annual evaluations for 2013-14 were based on school-level TVAAS estimates. And the remainder of these non-TVAAS teachers had thirty-five percent of their annual evaluations for the 2011-12 and 2012-13 school years based on school-level TVAAS estimates and twenty-five percent of their annual evaluations for the 2013-14 school year based on school-level TVAAS estimates.

36. To date, the State Board has only approved alternative measures that school districts may use for the "student growth" component of the annual evaluations of teachers of Fine Arts, World Languages, grades K-2, and as of 2014-15, Physical Education. But many school districts, including the Nashville District and Anderson District, have not implemented these alternative measures. Because the challenged State Evaluation Policy requires school districts to use school-level TVAAS estimates as the "student growth" component for non-TVAAS teachers for whom there is no alternate measure that has been both approved by the State Board and

implemented by the relevant school district, *see* State Evaluation Policy at 2, the few State-approved alternatives and even fewer district adoptions result in school-level TVAAS estimates being used as the "student growth" component in most non-TVAAS teachers' evaluations.

37. As for the distinct "other achievement" component of teachers' evaluations, because the State Board has approved school-level TVAAS estimates for use as this component too (which must comprise fifteen percent of teachers' annual evaluations, *see supra* paragraphs 17 & 19) and has approved relatively few alternatives for this component, *see* State Evaluation Policy at 4-5, many non-TVAAS teachers (including many teachers represented by Plaintiffs TEA, MNEA, and ACEA) are being assigned school-level TVAAS estimates for this required portion of their annual evaluations as well.

38. As a consequence, school-level TVAAS estimates often are being used to satisfy both the required "student growth" and "other achievement" components of the non-TVAAS teachers annual evaluations. *See* Tenn. Dep't of Educ., Teacher Evaluation in Tennessee: A Report on Year 2 Implementation, at 21-23 ("Year 2 Report"), *available at* http://www.tn.gov/education/teaching/docs/yr_2_tchr_eval_rpt.pdf.

39. The state-mandated curriculum content standards for instruction in non-TVAAS courses are entirely unrelated to the curriculum content standards for instruction in the TVAAS reading, mathematics, social studies, and science courses. For example, the middle school Physical Education curriculum standards that Plaintiff Wagner is employed and required to teach include specific motor skills such as running, dribbling, and balance skills; related concepts, such as understanding and applying offensive and defensive strategies in activities such as basketball and tennis; and understanding the importance of and maintaining physical activity. *See*

Tennessee Physical Education Curriculum Standards, Grades 6-8 Physical Education, *available at* http://www.tennessee.gov/education/standards/health/6-8PEandWellnessStandards2009.pdf. The middle school Visual Arts curriculum standards that Plaintiff Braeuner is employed and required to teach include understanding and use of different art media and understanding of elements of arts and design. *See* Tennessee Visual Art Curriculum Standards, Grades 6-8, *available at* http://www.tn.gov/education/standards/arts/ART_VA_6-8.pdf. In contrast, the TCAP sixth grade reading examination, which was designed to measure mastery of the sixth grade reading curriculum and nothing else, tests for the correct use of nouns, verbs, adjectives, prepositional phrases, synonyms, and antonyms; selecting appropriate thesis statements, supporting statements, and concluding sentences for a writing sample; and other aspects of the required English curriculum. The TCAP examinations for mathematics, science, and social studies similarly do not test the standards that Plaintiff Wagner and Plaintiff Braeuner are licensed, employed, and required to teach.

40. There is no rationale, pedagogical or otherwise, for evaluating a teacher such as Plaintiff Wagner or Plaintiff Braeuner based substantially on an estimate of student learning unrelated to the instruction the teacher is trained, licensed, and employed to provide and, in many instances, unconnected even to the students the teacher instructs. Doing so is not an intended use of the TVAAS formula. There is no educational research supporting evaluating teachers on the basis of such an irrelevant measure, much less any research establishing that it is anything but arbitrary to base a significant proportion of a teacher's annual evaluation (at least twenty-five percent and as much as forty percent as of the 2013-14 school year) on the basis of such a measure.

41. Not only does the use of such a measure result in teacher evaluations that are neither valid nor reliable, but the use of such measures runs directly contrary to the overriding rationale for using student test scores and value-added modeling to evaluate teachers, which is to evaluate the effectiveness of an individual teacher in enhancing her students' learning by attempting to isolate and attribute student learning to specific teachers. When such a model is applied to teachers who do not teach the tested material, however, the model effectively evaluates the non-TVAAS teacher based on the performance of other teachers who do teach the tested courses. Thus, rather than being evaluated based on the instruction they provide, teachers who do not teach courses measured by the state standardized tests used in the TVAAS formula are being evaluated based on the work of other teachers, and not at all based on a measure of how well they teach.

42. The school-level TVAAS estimates assigned to teachers without individual data are identical for each teacher assigned the score within a particular school. Therefore, by definition, such estimates do not differentiate the performance of individual teachers such as the Plaintiffs. The best and worst teacher in a school will have precisely the same "student growth" and "other achievement" components in his or her annual evaluation when the school-level TVAAS estimates are used for these components.

43. As the U.S. Department of Education has correctly concluded, "Measures of collective performance [such as school-level student growth estimates] mask high and low performers in the group and give little information about how individual teachers are doing with their classrooms." U.S. Dep't of Education, Reform Support Network, Measuring Student Growth for Teachers in Non-Tested Grades and Subjects, at 4, *available at*

http://www2.ed.gov/about/inits/ed/implementation-support-unit/tech-assist/measuring-student-growth-teachers.pdf.

44. Even if teachers who do not have individual TVAAS data could have some marginal effect on the scores of students in the tested courses throughout the school, any such effect would be tiny in comparison to the effects of teachers of the tested courses. Moreover, the TVAAS formula cannot—and does not even attempt to—isolate any such effect. In other words, even if Plaintiff Wagner's Physical Education classes and Plaintiff Braeuner's Visual Arts classes somehow were to include the curriculum of the English, math, social studies, and science courses tested by the TCAPs, the school-wide TVAAS estimates assigned to each of them still would say nothing about their effectiveness teaching TCAP material (much less about their effectiveness teaching physical education and art) because the English, math, social studies, and science teachers throughout the school would have a vastly larger impact on students' TCAP scores, and the TVAAS formula does not attempt to, and cannot, determine what Plaintiff Wagner's and Plaintiff Braeuner's respective miniscule contributions to their school-wide TCAP scores might have been.

45. The resulting evaluations using these school-level TVAAS estimates as a substantial component are not only arbitrary and irrational, but affirmatively harmful. This method of evaluation may produce worse outcomes than rewarding and punishing teachers randomly, because strong teachers are likely to be punished if they teach at high-needs schools that produce low school-level TVAAS scores. Conversely, poor teacher performance is likely to be masked in schools that produce high school-level TVAAS scores, an outcome that is neither desirable nor consistent with the accountability intended under the Act and the implementing State

Evaluation Policy and District Evaluation Policies. The result is to create a clear and direct incentive for teachers to avoid assignments in low-performing schools, thus increasing the difficulty of adequately serving those students most in need.

## V. THE EMPLOYMENT CONSEQUENCES OF THE MANDATED EVALUATIONS

46. The Act ties the required teacher evaluations directly to most employment decisions of consequence, including assignment, retention, compensation, tenure, and termination.

47. For example, teachers may be suspended or dismissed for "inefficiency," which is specifically defined to include having an overall performance rating of 2 (below expectations) or 1 (significantly below expectations). Tenn. Code Ann. §§ 49-5-501(6), 49-5-511(a)(2).

48. A teacher may not be granted tenure—*i.e.*, protection from discharge absent cause—unless his or her overall performance rating is a 4 (above expectations) or 5 (significantly above expectations) during the last two years of his or her probationary period. *Id.* § 49-5-504(a)(2). Tenured teachers (except those who attained tenure prior to July 1, 2011) must be returned to probationary status—*i.e.*, they lose protection from discharge absent cause—if their performance rating for two consecutive years is 2 (below expectations) or 1 (significantly below expectations). *Id.* § 49-5-504(e)-(f).

49. In addition, in fourteen school districts statewide, including Gra-Mar Middle Prep and twenty-one other schools in the Nashville District, teachers are eligible to receive a performance bonus under the Teacher Incentive Fund Grant ("TIF") program. Statewide, TIF grants must be based on performance ratings, with individual school districts setting the specific eligibility criteria.

50. The Nashville Board administers the district's TIF program, under which a teacher receives a TIF performance bonus if he or she receives an overall performance rating of 4 (above expectations) or 5 (significantly above expectations) and may receive such a bonus based on a variety of other criteria, many of which are TVAAS-based measures of performance. *See* Metro Nashville Pub. Sch., TIF Frequently Asked Questions, *available at* http://www.innovation.mnps.org/Page85813.aspx.

51. These arbitrary evaluation results control even how a teacher's future evaluations are conducted. Teachers who receive a rating of 5 (significantly above expectations) are subject only to one annual observation evaluation, whereas teachers who receive a 1 (significantly below expectations) are subject to at least six annual observations. Teachers who receive a 2, 3 or 4 are subject to at least four annual observations. *See* State Evaluation Policy at 7.

## VI. THE ARBITRARY CONSEQUENCES OF THE MANDATED EVALUATIONS FOR PLAINTIFFS

52. For each of the three school years since the Act's enactment (2011-12, 2012-13, and 2013-14), Plaintiff Theresa Wagner, a Physical Education teacher at Gra-Mar Middle Prep in the Nashville District, received an evaluation that included a school-level TVAAS estimate based on students' TCAP scores, including the test scores of some students she does not teach at all, because there are no TCAP or EOC standardized test scores for Physical Education that can be plugged into the TVAAS formula. Ms. Wagner's evaluation for the 2014-15 school year likewise is expected to include a school-level TVAAS estimate based on students' TCAP scores. Ms. Wagner is not trained, licensed, or employed to teach the reading, mathematics, social studies, and science courses upon which her TVAAS estimate is based, nor does she have any reasonable method for affecting in any substantial way school-wide student learning of reading,

mathematics, social studies, and science. Ms. Wagner received overall performance ratings of 5 for school years 2011-12 and 2012-13, based upon her observation results and the school-level TVAAS estimate of "5" in both of those years. For the 2013-14 school year, Ms. Wagner's overall performance rating fell to 3 because, although her observation results remained high and within the range for TIF eligibility, the school-level TVAAS estimate fell from "5" to "1." Ms. Wagner received the maximum TIF performance bonus for her overall rating of 5 in both the 2011-12 and 2012-13 school years ($2000 and $1000, respectively), but she was ineligible for and thus did not receive a TIF performance bonus for 2013-14 due to the school-level TVAAS estimate included in her evaluation.

53. In addition to this monetary loss, the arbitrarily low performance evaluation Ms. Wagner received as a result of being evaluated on the basis of student standardized test scores in courses she does not teach, including the standardized test scores of some students she does not teach at all, has harmed Ms. Wagner's professional reputation, and she has suffered emotional distress, anxiety, and diminished professional morale.

54. For each of the three school years since the Act's enactment (2011-12, 2012-13, and 2013-14), Plaintiff Jennifer Braeuner, a Visual Arts teacher at Norris Middle School, received an evaluation that included a school-level TVAAS estimate based on students' TCAP scores, including the test scores of some students she does not teach at all, because there are no TCAP or EOC evaluation scores for Visual Arts that can be plugged into the TVAAS formula. Ms. Braeuner's evaluation for the 2014-15 school year likewise is expected to include a school-level TVAAS estimate based on students' TCAP scores. Ms. Braeuner is not trained, licensed, or employed to teach the reading, mathematics, social studies, and science courses upon which her

TVAAS estimate is based, nor does she have a meaningful opportunity to affect in any substantial way school-wide student learning of reading, mathematics, social studies, and science. Ms. Braeuner received an overall performance rating of 4 for both school years 2011-12 and 2012-13, based upon her observation results and a school-level TVAAS estimate of "5" in each respective year. In 2013-14, Ms. Braeuner's overall performance rating fell to 3 because, although her observation results remained high, the school-level TVAAS estimate fell from "5" to "1."

55. Because the Act prohibits granting tenure to probationary teachers unless they receive an overall evaluation rating of "4" or "5" for each of the prior two school years, *see* Tenn. Code Ann. § 49-5-504(a)(2), the arbitrarily reduced performance rating Ms. Braeuner received prevented her from being considered for tenure at the end of the five-year statutory probationary period, and it will continue to prevent her from being considered for tenure unless and until she receives two consecutive annual evaluation ratings of at least "4." Additionally, the arbitrarily low performance rating Ms. Braeuner received as a result of being evaluated on the basis of student standardized test scores in courses she does not teach, some of which are from students she does not teach at all, has harmed Ms. Braeuner's professional reputation, and she has suffered emotional distress, anxiety, and diminished professional morale.

56. Plaintiffs TEA, MNEA, and ACEA represent many other teachers who have suffered similar harms as Ms. Wagner and Ms. Braeuner as a result of the arbitrary evaluations to which they have been subjected due to the Act as implemented in accordance with the State Evaluation Policy and District Evaluation Policies. Plaintiffs TEA, MNEA, and ACEA represent many elementary and secondary teachers who do not teach courses tested on state standardized tests

used with the TVAAS formula, most of whom now receive school-level TVAAS estimates as twenty-five or forty percent of their evaluations. Each such teacher is evaluated substantially on the basis of student test scores in courses the evaluated teacher is not trained, licensed, or employed to teach, and many of these teachers are evaluated substantially on the basis of test scores of students they do not teach at all. As a result, these teachers have suffered arbitrarily and irrationally diminished professional evaluations, causing harmful employment consequences, including lost compensation and the risk of termination (which has led some teachers to resign or retire), harm to such teachers' professional reputations, emotional distress, anxiety, and diminished professional morale.

57. The mandate under the State Evaluation Policy and the challenged District Evaluation Policies as implemented, which result in non-TVAAS teachers such as the Plaintiffs being evaluated for purposes of all high-stakes employment decisions substantially on the basis of student learning growth estimates that do not reflect the learning of students in the classes they instruct, is arbitrary, irrational, unfair, and unlawful.

**Count One: Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution**

58. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

59. The Due Process Clause of the Fourteenth Amendment provides that "No state shall . . . deprive any person of life, liberty, or property, without due process of law." Under the "substantive" component of the Due Process Clause, a state or locality cannot subject individuals to arbitrary or capricious legislative or administrative action.

60. The State Evaluation Policy, Nashville Evaluation Policy, and Anderson Evaluation Policy (collectively, the "Policies"), on their face and as implemented, are arbitrary, capricious, and not rationally related to a legitimate governmental purpose because they require Individual Plaintiffs and other teachers represented by TEA, MNEA, and ACEA as a condition of their public employment to be evaluated substantially on the basis of student standardized test scores unrelated to the courses they teach, which do not reflect the instruction that those teachers are trained, licensed, employed, and required to provide.

61. The resulting evaluations harm such teachers' pay, job security, and professional reputations. This harm is magnified by the Act's requirement that decisions related to promotion, retention, termination, pay, tenure, and other employment decisions be made on the basis of teachers' evaluation ratings, as well as the TIF program requirement that TIF bonuses be awarded based on these evaluation ratings.

62. Because these arbitrary and capricious Policies have caused injury to the Plaintiffs, the Policies violate Plaintiffs' rights under the Due Process Clause.

63. In addition, the Policies violate Plaintiffs' rights under the Due Process Clause because, consistent with the liberty and property interests protected by the Due Process Clause, a state may not impose punishments and other legal burdens on individuals for actions for which they had no responsibility or ability to control.

**Count Two: Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**

64. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

65. The Equal Protection Clause of the Fourteenth Amendment provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." This

guarantee requires that any classification implemented by a state or locality be rationally related to a legitimate governmental purpose.

66. Under the State Evaluation Policy, the Nashville Evaluation Policy and the Anderson Evaluation Policy (collectively, the "Policies), on their face and as applied, more than half of the teachers in the State are evaluated in substantial part on the basis of school-level TVAAS estimates that are unrelated to the courses such teachers are trained, licensed, employed, and required to teach. Rather than reflecting student test results in the courses taught by these teachers, these estimates are an aggregation of test scores for courses taught by other teachers in the school. For all other teachers in the State, the corresponding portion of their evaluation is based on their students' test results for the courses that they teach.

67. Teachers' evaluations are directly tied to almost all employment decisions of consequence, including promotion, retention, termination, compensation, tenure, and other employment decisions. There is no rational reason to classify non-TVAAS teachers on the basis of student test scores that are unrelated to the courses such teachers are trained, licensed, employed, and required to teach, while classifying TVAAS teachers on the basis of their own students' scores for tests directly aligned to the content standards for the specific courses such teachers teach.

68. Indeed, basing a substantial portion of a teacher's evaluation on test scores from courses and students that the teacher does not teach is not rationally related to any legitimate governmental purpose and serves to undermine, rather than advance, the quality of Tennessee public schools. For example, teachers without individual TVAAS data at schools that produce low school-level TVAAS estimates, such as the Individual Plaintiffs in 2013-14, are much more

likely to suffer negative employment consequences—including loss of tenure and termination—than teachers at schools with high school-level TVAAS estimates.

69. Because Individual Plaintiffs and other teachers represented Plaintiffs TEA, MNEA, and ACEA who do not have individual TVAAS estimates have been injured by the State Evaluation Policy and the District Evaluation Policies of evaluating them substantially on the basis of student standardized test scores for courses unrelated to the courses they teach, and often from students they do not teach, these Policies violate Plaintiffs' rights under the Equal Protection Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

a. Declare that the provisions of the State and District Evaluation Policies, and/or any practices implementing said policies, requiring the evaluation of teachers without individual TVAAS data using school-level TVAAS estimates violate the due process and equal protection rights of Plaintiffs under the Fourteenth Amendment of the United States Constitution;

b. Permanently enjoin Defendant Haslam, Defendant McQueen, and the Defendant BOE members, their successors, and all those acting in concert with them or at their direction, from implementing or enforcing such provisions of the State Evaluation Policy;

c. Permanently enjoin Defendants Nashville Board and Anderson Board, and all those acting in concert with them or at their direction, from implementing or enforcing such provisions of the State Evaluation Policy and the District Evaluation

Policies, and from using for any purpose school-level TVAAS estimates in the evaluations of teachers without individual TVAAS data;

d. Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and such other statutory and common law provisions as may be applicable; and

e. Grant such other and further relief as may be necessary and proper to restore the *status quo ante*.

Respectfully submitted this 5th day of February, 2015.


Alice O'Brien* (DC Bar No. 454999)
Lisa M. Powell* (DC Bar No. 498601)
National Education Association
1201 Sixteenth Street, N.W.
Washington, D.C. 20036-3290
(202) 822-7043 Telephone
aobrien@nea.org
lpowell@nea.org

/s/ Richard L. Colbert
Richard L. Colbert, #9397
Kay, Griffin, Enkema & Colbert, PLLC
222 Second Avenue North
Suite 340-M
Nashville, T.N. 37201
(615) 742-4800 Telephone
rcolbert@kaygriffin.com

Steven B. McCloud, #016487
Tennessee Education Association
801 Second Avenue North
Nashville, Tennessee 37201
(615) 242-8392 Telephone
smccloud@tnea.org

John M. West* (DC Bar No. 424718)
Jacob Karabell* (DC Bar No. 996066)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005
(202) 842-2600 Telephone
jwest@bredhoff.com
jkarabell@bredhoff.com

*Counsel for Plaintiffs*


* *Pro Hac Vice* Motions To Be Filed.